914 F.2d 260
 Unpublished Disposition
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Raymond C. LAMB, Petitioner-Appellant,
v.
Jack R. DUCKWORTH, Respondent-Appellee.
 No. 89-1899.
 United States Court of Appeals, Seventh Circuit.
 Submitted Aug. 29, 1990.*
Decided Sept. 10, 1990.
 
 Before FLAUM, MANION and KANNE, Circuit Judges.
 
 ORDER
 
 1
 Raymond C. Lamb appeals from an order of the district court denying his petition for a writ of habeas corpus pursuant to 28 U.S.C. Sec. 2554. We affirm.
 
 I.
 
 2
 On February 13, 1973, Kathryn Kauffman was found shot in the parking lot of Sanders' Cleaners and Laundry, Inc. (Sanders') in Greenwood, Indiana, where she worked. Miss Kauffman was pronounced dead on arrival at the hospital, and an autopsy revealed that she had been shot four times with a .38 caliber pistol. There were no witnesses, and the police never found the murder weapon.
 
 
 3
 Also on February 13, 1973, a scanner radio was stolen from a truck parked at the Greenwood Middle School, which is located approximately two blocks from Sanders'. Lamb was arrested in Maryland for the scanner theft in March of 1973 and held in the Johnson County Jail, Indiana. Lamb admitted stealing the scanner.
 
 
 4
 Lamb testified that from March through August 1973 while he was incarcerated at the Johnson County Jail, he was interrogated between twenty-five to thirty times, approximately twice a week, by various individuals associated with different state and federal law enforcement agencies about the theft, the Kauffman murder and the murder of another young woman, Carol Rhodes, which the police were investigating. On September 1, 1973, Lamb asked to speak to John Lasiter, a lieutenant with the Johnson County Sheriff's Department. After Lasiter arranged for Lamb to telephone his wife, he confessed to the two murders. On September 6, 1973, Lasiter had Lamb make an audiotape recording of the confessions. Lamb was subsequently charged with the Kauffman murder, but was not charged with the Rhodes murder.
 
 
 5
 At Lamb's trial for the murder of Kathryn Kauffman, defense counsel moved to suppress the confessions, arguing that they were coerced. The trial court denied the motion and allowed the confessions into evidence. In its case-in-chief, the prosecution sought to have the tape-recorded confessions played for the jury, and defense counsel did not object. The court called a side-bar and told defense counsel that he would sustain an objection and a request that those portions relating to the Rhodes murder not be played, but counsel would not object. The prosecutor offered to read from the transcript and redact the portions relating to the Rhodes murder, but defense counsel objected on the ground that the transcript had not been verified and that the audiotape was the "best evidence." The prosecution then played only the audiotapes relating to the Kauffman murder. Despite the prosecution's effort, the introductory portion of the audiotapes contained scattered references to the fact that Lamb was a suspect in "two homicides" and that he was about to confess to the murders of Kathryn Kauffman and Carol Rhodes.
 
 
 6
 In addition to the confession, the prosecution called Charles Eaton, a cellmate of Lamb's, who testified to incriminating statements Lamb had made while at the Johnson County Jail. The prosecution also called Lamb's wife, Bonnie Rybolt, who placed Lamb near the scene at the time of the crime with a .38 caliber pistol.
 
 
 7
 Defense counsel's motivation in not objecting was related to the theory of defense. Defense counsel presented evidence of a ballistics test which revealed that Miss Kauffman and Miss Rhodes were killed by bullets shot from the same weapon. Counsel's theory seems to have been that since Lamb had not been connected to the Rhodes murder and since the women were killed by bullets fired from the same gun, that Lamb could not be guilty of the Kauffman murder. Counsel also had Lamb take the stand and testify that he confessed to the two murders because his will was overborne by the frequency and intensity of the police interrogations and the threat that Bonnie would be implicated and his family broken up.
 
 
 8
 The jury returned a verdict of guilty of first degree murder, and the court sentenced Lamb to life imprisonment. Lamb appealed his conviction to the Indiana Supreme Court which affirmed his conviction on June 4, 1976. Lamb v. State, 348 N.E.2d 1 (1976). Lamb filed a petition for post-conviction relief which was denied on February 8, 1985, and the supreme court affirmed the denial on August 10, 1987. Lamb v. State, 511 N.E.2d 444 (1987).
 
 
 9
 Lamb then filed a petition for a writ of habeas corpus which the district court denied on March 16, 1989. On April 14, 1989, Lamb filed a notice of appeal, and the district court granted Lamb's application for a certificate of probable cause on April 26, 1989. Lamb raises four issues on appeal: (1) the voluntariness of his confession; (2) ineffective assistance of counsel; (3) failure of the state to disclose a "deal" with Eaton; and (4) prosecutorial misconduct in conducting voir dire. We will address these in turn.
 
 II.
 A. Voluntariness of Lamb's Confession
 
 10
 Lamb contends that he confessed under duress. He argues that the repeated interrogations and the "direct or implied threat" that his wife would be implicated in the scanner theft overpowered his will, causing him to confess.
 
 
 11
 We must make a determination independent of that of the state courts as to whether the state obtained the confession in a manner that is consistent with due process. See Miller v. Fenton, 474 U.S. 104, 112 (1985). We conclude that Lamb's confession was voluntary. When Lamb gave his confession, he had been in jail for approximately six months and claims to have been interrogated between twenty-five to thirty times.[1] Lamb's testimony at trial undermines his argument that the series of interrogations destroyed his free will. On cross-examination, the prosecutor and Lamb had the following exchange:
 
 
 12
 Q. The fact of the matter is you liked the opportunity to get out of your cell, didn't you?
 
 
 13
 A. Yes, sir.
 
 
 14
 .............................................................
 
 
 15
 ...................
 
 
 16
 * * *
 
 
 17
 Q. Didn't you like to get out of the cell and be questioned because it gave you an opportunity to get outside your cell?
 
 
 18
 A. Yes, sir, and get something to drink and something fairly decent to eat.
 
 
 19
 Q. So you really didn't mind all this questioning that you have talked about, did you?
 
 
 20
 A. Yes and no, sir.
 
 
 21
 Q. What do you mean yes and no?
 
 
 22
 A. Well I didn't mind being questioned so much but what got to me was about bringing Bonnie back and this other stuff....
 
 
 23
 We do note, however, that Lamb's action appears to have been motivated in part by his concern for his wife and children. The police deny that they presented Lamb with the alternative that either he confess to the murders or else they would charge Bonnie in the theft. At trial, Lamb equivocated and was unable to name any individual who had made such a threat, but suggested that it was implied in their statements.[2] Starting in July of 1973, John Lasiter and John Means of the Johnson County Sheriff's Department, began questioning Lamb approximately twice a week. These sessions lasted for thirty to forty-five minutes. In addition, Lasiter and Means stopped questioning Lamb two to three weeks before Lamb confessed. We note that Lamb himself asked to see Lasiter on September 1, 1973. Lamb's decision to confess appears to have been the result of careful reflection. We do not believe that the totality of these circumstances supports a finding that Lamb's confession was involuntary.
 
 B. Ineffective Assistance of Counsel
 
 24
 Lamb next alleges ineffective assistance of counsel. Specifically, Lamb points to counsel's failure to object when the prosecution sought to introduce the audiotapes of Lamb's confession to keep the irrelevant portions relating to the Rhodes murder out of evidence. To establish a claim of ineffective assistance of counsel, Lamb must satisfy the cause and prejudice standard articulated in Strickland v. Washington, 466 U.S. 668 (1984). That is, Lamb must show that counsel's performance fell below an objective standard of reasonableness and that counsel's conduct was so prejudicial that it deprived him of a fair trial.
 
 
 25
 Counsel tried unsuccessfully to have the confession suppressed. Consequently, counsel was faced with the prospect of defending Lamb against his own confession to police and to his cellmate, as well as incriminating statements made by Bonnie, who placed Lamb within two blocks of the scene of the crime with a gun. An insanity defense was not an option as Lamb was examined by a psychiatrist who found no mental problems. Counsel had few options. It appears that counsel did not object to the introduction of this evidence because it was part of his theory of defense. Apparently, because the ballistics tests indicated that Miss Kauffman and Miss Rhodes were killed by the same weapon, defense counsel attempted to prove that since Lamb had not been implicated in the Rhodes murder, that he could not have been Miss Kauffman's murderer. The defense was a long-shot, but under the circumstances, we cannot say that counsel was deficient in pursuing it.
 
 
 26
 We also note that, despite the fact that defense counsel did not object, the prosecutor did not play that part of the audiotape in which Lamb confessed to the Rhodes murder. The jury did hear scattered references to the "two homicides" and "murders " in the tapes as well as from defense counsel himself who referred to the Rhodes murder in his case-in-chief, but we cannot conclude that this deprived Lamb of a fair trial.
 
 C. Prosecutorial Misconduct
 
 27
 Lamb's third ground for habeas relief is that the state struck a secret "deal" with its witness, Charles Eaton, and failed to disclose this deal to the jury. Lamb contends that this is reversible error. Lamb admits that he has no direct evidence that the state offered Eaton a reduced sentence to the charges he was facing in exchange for his testimony against Lamb, but states that "the facts fairly shout that that is what happened." We disagree. The record indicates that Eaton reached a plea agreement with the state and was sentenced before he told anyone about his conversations with Lamb. We also note that the prosecution fully informed the jury of Eaton's criminal record and asked Eaton whether the plea bargain, in which he pleaded guilty to involuntary manslaughter when he was charged with first degree murder, was in exchange for his testimony against Lamb, Eaton responded that his plea agreement was not conditioned on his testimony. This claim is unsubstantiated and without merit.
 
 
 28
 D. Statement Made to the Prospective Jurors at Voir Dire
 
 Regarding the Presumption of Innocence
 
 29
 Finally, Lamb challenges the following statement which the prosecution read to the prospective jurors:
 
 
 30
 The rule of law which throws around the defendant the presumption of innocence and requires the State to establish beyond a reasonable doubt every material fact averred in the indictment is not intended to shield those who are actually guilty from just and merited punishment, but is a humane provision of the law which is intended for the protection of the innocent, and to guard so far as human agencies can, against the conviction of those unjustly accused of crime.
 
 
 31
 This statement was approved as a proper jury instruction in an 1885 Indiana case. Anderson v. State, 4 N.E. 63 (1885). Lamb argues that the presumption of innocence is meant to protect both the innocent and the guilty, and may in fact shield someone who is actually guilty when the prosecutor cannot produce proof to convince a jury beyond a reasonable doubt. Lamb notes that the trial court later did properly instruct the jury on the presumption of innocence,[3] but contends that the prosecutor's actions nonetheless constituted fundamental error since the jurors had been "systematically indoctrinated by the prosecutor that [the presumption of innocence] did not apply to guilty people well before the trial began." Lamb alleges that this violated his right to due process. We do not agree. Lamb has made no showing of prejudice, and the jury was properly instructed on the presumption of innocence before it deliberated. In addition, there was sufficient evidence to overcome the presumption of innocence. We cannot conclude that Lamb was deprived of a fair trial as a result of the prosecutor's reading this statement to the prospective jurors.
 
 III.
 
 32
 For the reasons discussed above, we AFFIRM the order of the district court denying Lamb's petition for a writ of habeas corpus.
 
 
 33
 AFFIRMED.
 
 
 
 *
 After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Rule 34(a), Fed.R.App.P.; Circuit Rule 34(f). The parties filed a "Renewed Joint Motion To Waive Oral Argument" which was granted on October 17, 1989. The appeal is submitted on the briefs and record
 
 
 [1]
 Lamb does not allege that the police failed to advise him of his Miranda rights before these interrogations
 
 
 [2]
 Lamb was able to name an individual who had threatened that if he did not confess to the theft of the scanner that he would arrest Bonnie. The voluntariness of this confession, however, is not at issue
 
 
 [3]
 The court charged the jury with a proper presumption of innocence instruction and also with the 1885 instruction. Defense counsel did not object to the 1885 instruction at this time, nor does he challenge it on appeal